**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| DAVID GARAY,<br><br>        Plaintiff,<br><br><br>   vs.<br><br><br>BRIAN R. GAMACHE, LOUIS J. NICASTRO, EDWARD W. RABIN, JR., ROBERT J. BAHASH, PATRICIA M. NAZEMETZ, NEIL D. NICASTRO, IRA S. SHEINFELD, BOBBY L. SILLER, WILLIAM J. VARESCHI, JR., KEITH R. WYCHE, AND HAROLD H. BACH, JR.<br><br>        Defendants,<br><br>  -and-<br><br>WMS INDUSTRIES INC.,<br><br>        Nominal Defendant. | Civil Action<br>No._____<br><br>SHAREHOLDER DERIVATIVE<br>COMPLAINT<br><br><br><br>DEMAND FOR JURY TRIAL |

## COMPLAINT

      Plaintiff, David Garay, ("Garay" or "Plaintiff") files this Complaint for Breach of Fiduciary Duty, Gross Mismanagement, Contribution and Indemnity, Abuse of Control, and Waste of Corporate Assets.

### SUMMARY OF THE ACTION

      1.    This is a derivative case brought on behalf of WMS Industries Inc. ("WMS," "WMS Industries," or the "Company") against certain of its officers and/or directors for breach of fiduciary duty, gross mismanagement, contribution and indemnity,

1

abuse of control, and waste of corporate assets from November 1, 2010 through April 11, 2011 ("Relevant Period"). Plaintiff, by and through his attorneys, brings this action derivatively on behalf of nominal defendant WMS and alleges upon personal knowledge as to himself and his own acts, and as to all other matters based upon the investigation conducted by his attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings, documents, analyst reports, news reports, press releases, and other publicly-available information regarding the Company, as follows:

2. WMS Industries, a Delaware corporation with its corporate headquarters in Waukegan, Illinois, designs, manufactures and distributes both video and mechanical slot machines and video lottery terminals ("VLTs"). The Company generates sales revenue from sales to casinos and other licensed gaming machine operators of new and used gaming machines and VLTs, conversion kits for existing gaming machines and gaming-related systems. The Company also records gaming operations revenue from leasing gaming machines and VLTs to casinos and other licensed gaming machine operators.

3. WMS Industries' primary clientele are customers in the legalized gaming industry, particularly casinos. The Company relies in large part on the replacement cycle of gaming machines at casinos and new casino openings to sell and place its games. According to the Company, the casino operators' desire for maximum profitability has created demand for games that generate superior net daily wins. Because of that phenomenon, the Company and other gaming manufacturers continuously endeavor to increase the entertainment value of their gaming machines, in turn driving demand for

replacement of older games. The Company is thus dependant upon the development and commercialization of innovative new games and demand from casino operators to generate growth.

4.     In June 2010, the Company launched its new Bluebird xD gaming cabinet as a compliment to its premium Bluebird2 gaming platform, which had represented 82% of the Company's new game unit sales in fiscal 2010. According to the Company, Bluebird xD added significant ergonomics for comfortable player seating, large high definition screens, and an advanced sound system. The Bluebird xD was also smaller in size, which allowed casinos to place more games in the same space.

## INTRODUCTION AND BACKGROUND

5.     During 2008, the financial crisis in the United States substantially impacted the gaming industry causing some casino operators to delay expansions or new casino openings. More importantly, these challenges resulted in lower casino capital budgets, reduced demand and a lengthening of and slower replacement cycle for new games from gaming manufacturers. The Company's August 26, 2010 Form 10-K described the United States and Canadian replacement cycle as abnormally slow and stated that gaming manufacturers were experiencing an overall challenging replacement cycle for gaming products.

6.     On August 3, 2010, the Company issued its fourth quarter and fiscal 2010 financial results, stating that its strong results were achieved despite the sluggish replacement market. The Company also initiated its full year fiscal 2011 financial guidance with a forecast of $830-$850 million in revenues and 22.5%-23% operating margin growth.

3

7.     On September 21, 2010, the Company held its first Analyst Day in Chicago, Illinois, where presentations were made by both Chairman of the Board and Chief Executive Officer ("CEO") Brian R. Gamache ("Gamache") and Executive Vice President, Chief Financial Officer ("CFO") and Treasurer Scott D. Schweinfurth ("Schweinfurth"). Company management discussed the background of the Company and its outlook for growth in fiscal 2011 and beyond, and conveyed to analysts attending the presentations that the Company's financial outlook for growth in fiscal 2011 was not all dependant on an uptick in casino operator capital budgets or the replacement cycle:

> [Gamache:] [O]ne of those things I hope you get out of today's presentation is that the guidance that we provided for our fiscal '11 year, is not based on any real uptick in the replacement cycle during that period of time. We have other levers that are going to drive the performance of the Company and the earnings growth of the Company moving forward . . . .

8.     WMS also stated that weekly forecast meetings gave the Company real-time information, allowing the Company to react quickly when things did not go as planned:

> [Schweinfurth:] Many of you heard me say that the most important meeting that we have each and every week here at WMS is our forecast meeting. We have people that are responsible for revenues. We have people that are responsible for monitoring costs. That group feeds data into my finance team every week.
>
> We meet Wednesday afternoons, and we look at what's happening in our business for this quarter and the future quarters. And because we have that data, real time, we can react to it real time, because there's times that things don't quite go as we thought they were going to go, and we need to come up with a plan B. Well, having our finger on the pulse of what's happening enables us to [do] that.

9.     Thus, WMS, in the face of a known industry-wide slowdown in demand and lengthening of the replacement cycle for gaming products, continued to boldly report that the Company had and would continue to distinguish itself from its competitors by

4

posting sales revenue and margin gains without the benefit of, or need for, the recovery of overall demand or the casino gaming replacement cycle.

10.     According to the Company, WMS Industries could and would report 2011 revenue of $830-$850 million and margin growth of 20%-21%, even without a demand increase in the currently weak replacement cycle and environment for its gaming products because of: (1) WMS Industries' scheduled release of new games in the second half of fiscal 2011; (2) its track record of meeting or beating forecasted revenue and margin expectations; and (3) its ability to expertly refine its efficiencies and execute on planned business operations.

11.     In identifying the Company's key competitors as International Game Technology and Bally Technologies with the reporting of the Company's first quarter 2011 financial results, defendant Gamache stated the following:

> Our full-year guidance for fiscal 2011, which we reiterated this afternoon, underscores our expectation that we will continue to achieve top and bottom line growth throughout our fiscal year in the face of the continued impact from the slow replacement cycle . . . .

> * * *

> When you combine our top line success with our vigilance on operating execution, you will see why we have been able to consistently achieve our targets for growth in revenues, profitability and cash flow.

12.     On January 25, 2011, the Company reported its second quarter 2011 financial results, including a miss of Wall Street second quarter 2011 earnings and margins estimates. The Company also reduced its fiscal 2011 margin forecast, explaining that while demand in the second quarter for its top products (Bluebird and Bluebird xD) remained strong, sales of lower margin products outstripped sales of these new higher margin products. Rejecting analysts' concerns that the Company's fiscal 2011 forecasts

5

appeared lofty in light of the second quarter results, WMS again assured investors that because of continuing strong demand for the Company's new and soon to be released games, WMS Industries simply would not be negatively affected by the slow industry-wide replacement cycle, and that the Company was solidly "on track" to generate revenue and margin growth throughout the remainder of fiscal 2011. The January 25, 2011 press release stated:

> "'WMS' revenue gains were again driven by strong global demand for our Bluebird2 and new Bluebird xD premium gaming machines . . . .'"

13.    In a conference call the same day, defendant Gamache stated:

> Given our performance in the first half of fiscal 2011, and our current visibility for the second half, we are reaffirming our full year guidance today of $830 million to $850 million.
>
> * * *
>
> [O]ur performance in fiscal 2011 remains solidly on track to generate quarterly sequential revenue and operating margin growth over the next two quarters, as we build momentum for a strong fiscal 2012.
>
> * * *
>
> With our track record of innovation in chip share gains . . . we have offset the impact of the economy and the gaming industry challenges . . . .

14.    After January 25, 2011, WMS Industries' shares continued to trade at artificially inflated prices of as high as $43.92 per share.

15.    Then on April 11, 2011, the Company pre-announced its third quarter 2011 financial results, stating that it had again missed Wall Street earnings projections by $0.11 per share, reporting $0.40-$0.42 as opposed to consensus estimates of $0.51. The Company also reported that its revenue forecast for the third quarter of 2011 would be cut by up to $24 million and revenues for fiscal 2011 would be cut by up to $60 million.

6

Thus, as opposed to reporting revenue of $209-$215 million in the third quarter of 2011, the Company would post between $191-$193 million. In addition, for fiscal 2011, as opposed to $830-$850 million in revenues, the Company would report $790-$800 million. In direct contrast to bullish statements made on January 25, 2011 about strong demand, new product launches and unsurpassed execution, defendants blamed the shortfall on "execution challenges," weak demand, delays in the development of new products, and slower regulatory process approval.

16.     Finally the Company reported that WMS Industries did not expect demand to recover for the remainder of fiscal 2011 or 2012, and thus cut its forecasted fiscal 2012 revenue estimates by up to $120 million.

17.     On April 12, 2011, as a result of these alarming disclosures, WMS Industries' stock price declined more than 17% to close at $30.01 on massive volume of 9.8 million shares traded, down from a close of $36.22 on April 11, 2011.

18.     WMS' representations concerning the Company's current business and financial condition, including its forecasted financial results, were each materially false and misleading when made because the Company failed to disclose the following true facts which were known to defendants or recklessly disregarded:

(a)     The Company's purported current "execution" on business operations was faltering and could not drive and support revenue and profitability guidance;

(b)     The industry-wide weak replacement cycle had negatively impacted the Company's sales and margin growth and could not be offset by currently flawed execution and demand for WMS Industries' gaming machines; and

(c)     As a result of the above, the Defendants did not have a reasonable basis to make the revenue and margin forecasts for fiscal 2011 for the Company in light of known negative business and industry trends.

7

## JURISDICTION AND VENUE

19.     Personal jurisdiction is proper over each Defendant because each Defendant is a resident and citizen of the State of Illinois and has engaged in substantial business in the State of Illinois. Subject matter jurisdiction is proper in this Court because complete diversity of citizenship exists as Plaintiff is a resident and citizen of the State of California and Defendants are citizens and residents of the states of Illinois and Delaware. The amount in controversy exceeds $75,000. 28 U.S.C. §1332.

20.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b), because WMS Industries is headquartered in this district and many of the acts and practices complained of herein occurred in substantial part in this district.

## PARTIES

21.     Plaintiff David Garay is an individual resident and citizen of California who purchased or acquired WMS Industries common stock as described in the attached certification and was damaged thereby.

22.     Defendant WMS Industries is incorporated in Delaware and trades on the New York Stock Exchange ("NYSE") under the symbol "WMS." The Company's headquarters are located at 800 S. Northpoint Blvd., Waukegan, Illinois.

23.     Defendant Brian R. Gamache ("Gamache") is, and was at all relevant times, Chairman of the Board of Directors and CEO of the Company. Gamache rejoined WMS in April 2000 as President and Chief Operating Officer ("COO"), and was named President and CEO, along with his appointment to the Board of Directors, in June 2001. Plaintiff is informed and believes, and thereupon alleges, that Gamache is a citizen of the State of Illinois.

8

24.     Defendant Louis J. Nicastro ("Louis Nicastro") is, and was at all relevant times, a Founding Director for the Company. Louis Nicastro has served as a director since the Company's incorporation in 1974, and has served as the Company's Chairman of the Board from 1974 until 2008. Additionally, Louis Nicastro served as the Company's CEO from 1998 until June 2001, and was also President from 1998 to April 2000. Louis Nicastro also served as WMS' CEO or Co-CEO from 1974 to 1996, and as President during the periods 1985-1988 and 1990-1991, among other executive positions. Louis Nicastro is Neil D. Nicastro's father. Plaintiff is informed and believes, and thereupon alleges, that Louis Nicastro is a citizen of the State of Florida.

25.     Defendant Edward W. Rabin, Jr. ("Rabin") is, and was at all relevant times, a director for the Company. Rabin became the Company's Lead Director in July 2008. Rabin served as the President of Hyatt Hotels Corporation from 2003 until his retirement in January 2006. Between 1989 and 2003, Rabin served as Executive Vice President for Hyatt Hotels Corporation, and was named COO in 2000. Additionally, Rabin is a director of PrivateBancorp, Inc. (NASDAQ-PVTB), Sally Beauty Holdings (NYSE: SBH), and Oneida Ltd. Rabin serves as Chairman of WMS' Compensation Committee, and is a member of the Company's Audit and Ethics Committee. Plaintiff is informed and believes, and thereupon alleges, that Rabin is a citizen of the State of Illinois.

26.     Defendant Robert J. Bahash ("Bahash") is, and was at all relevant times, a director for the Company. Bahash joined WMS' Board in September 2007. Bahash has served as Executive Vice President and CFO for The McGraw-Hill Companies since 1988. Bahash has been with McGraw-Hill since 1974 and has held a number of finance-

9

related positions. Bahash is a member of the American Institute of Certified Public Accountants, the Financial Executives Institute, and the New Jersey Society of Certified Public Accountants. Bahash is also a certified public accountant and a member of the Company's Audit and Ethics Committee and Compensation Committee. Plaintiff is informed and believes, and thereupon alleges, that Bahash is a citizen of the State of New Jersey.

27. Defendant Patricia M. Nazemetz ("Nazemetz") is, and was at all relevant times, a director for the Company. Nazemetz joined the Company's Board in December 2007. Nazemetz has served as Chief Human Resources and Ethics Officer for Xerox Corporation since 2007. Nazemetz has also served as a Vice President for Xerox Corporation since January 1999. Nazemetz has been with Xerox since 1979 and has held a number of human resource related positions. Nazemetz is also a trustee of Fordham University. Nazemetz is a member of the Company's Compensation Committee and Nominating and Corporate Governance Committee. Plaintiff is informed and believes, and thereupon alleges, that Nazemetz is a citizen of the State of New York.

28. Defendant Neil D. Nicastro ("Neil Nicastro") is, and was at all relevant times, a director for the Company. Neil Nicastro has served in various executive positions for WMS, including President, CEO and COO, beginning in 1986 until his resignation from all executive positions in 1998. Neil Nicastro served as Midway's President from 1991 until May 2003 and CEO from 1996 to May 2003. Neil Nicastro also served as Midway's Chairman of the Board from 1996 until June 2004. Neil Nicastro is Louis Nicastro's son. Neil Nicastro is a member of the Company's Gaming

10

Compliance Committee. Plaintiff is informed and believes, and thereupon alleges, that Neil Nicastro is a citizen of the State of Illinois.

29. Defendant Ira S. Sheinfeld ("Sheinfeld") is, and was at all relevant times, a director for the Company. Sheinfeld has been a member of the law firm of Hogan & Hartson, LLP and a predecessor law firm, Squadron, Ellenoff, Plesent & Sheinfeld LLP, New York, New York, for more than five years. Plaintiff is informed and believes, and thereupon alleges, that Sheinfeld is a citizen of the State of New York.

30. Defendant Bobby L. Siller ("Siller") is, and was at all relevant times, a director for the Company. Siller joined the Company's Board in January 2008. Siller was one of three members of the Nevada State Gaming Control Board serving for eight years from January 1999 until December 31, 2006. Siller is a member of the Company's Gaming Compliance Committee and Nominating and Corporate Governance Committee. Plaintiff is informed and believes, and thereupon alleges, that Siller is a citizen of the State of North Carolina.

31. Defendant William J. Vareschi, Jr. ("Vareschi") is, and was at all relevant times, a director for the Company. Vareschi was the CEO and Vice Chairman of the Board of Central Parking Corporation from April 2001 until his retirement in May 2003. Before joining Central Parking Corporation in April 2001, Vareschi's prior business career of more than 35 years was spent with the General Electric Company, which he joined in 1965. Vareschi held numerous financial management positions within GE, including CFO for GE Plastics Europe (in the Netherlands), GE Lighting (Cleveland, Ohio), and GE Aircraft Engines (Cincinnati, Ohio). In 1996, Vareschi became President and CEO of GE Engine Services, a position he held until July 2000. Vareschi also serves

11

as lead director, chairman of the executive committee, and a member of the audit committee of WESCO International Inc. (NYSE: WCC). Vareschi serves as Chairman of the Company's Nominating and Corporate Governance Committee and is a member of the Company's Audit and Ethics Committee. Plaintiff is informed and believes, and thereupon alleges, that Vareschi is a citizen of the State of Florida.

32. Defendant Keith R. Wyche ("Wyche") is, and was at all relevant times, a director for the Company. Wyche joined the Company's Board in January 2011. Wyche is currently President and CEO of Cub Foods. Wyche joined Cub Foods in January 2010 from Pitney Bowes where he most recently served as President of U.S. Operations for Pitney Bowes Management Services. Wyche had been with Pitney Bowes since 2003 and held a number of progressively more responsible positions general management, sales and operations. Plaintiff is informed and believes, and thereupon alleges, that Wyche is a citizen of the State of Minnesota.

33. Defendant Harold H. Bach, Jr. ("Bach") was at all relevant times, a director for the Company. Plaintiff is informed and believes, and thereupon alleges, that Bach is a citizen of the State of Illinois.

34. Defendants Gamache, Louis Nicastro, Rabin, Bahash, Nazemetz, Neil Nicastro, Sheinfeld, Siller, Vareschi, Wyche, and Bach are collectively referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

35. By reason of their positions as officers and directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations

12

of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit.

36.     Each director and officer owed to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information concerning the Company's revenue, margins, operations, performance, management, projections, and forecasts, so that the market price of the Company's stock would be based on truthful and accurate information.

37.     The Individual Defendants, because of their positions of control and authority as directors and/or officers, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their executive, managerial, and/or directorial positions within the Company, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and misrepresentations made.

38.     At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of the Company, and was at all times acting within the course and scope of such agency.

39.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

a.     manage, conduct, supervise and direct the business affairs of the Company in accordance with all applicable laws;

b.     neither violate, nor knowingly permit any officer, director or employee of the Company to violate, applicable laws, rules and regulations;

c.     establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

d.     neither engage in self-dealing, nor knowingly permit any officer, director or employee of the Company to engage in self-dealing;

e.     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

f.     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

g.     properly and accurately guide investors and analysts regarding the true financial condition of the Company at any given time, including making accurate

14

statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

      h.    remain informed regarding how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

      40.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and its shareholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants alleged herein involves a violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining defendants.

      41.    The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent its financial results and prospects, as detailed herein, and by failing to prevent employees and/or officers of the Company from taking such illegal actions. In addition, the Company is now the subject of class action litigation alleging violation of federal

15

securities laws, which necessitates the Company to incur excess costs arising from the Individual Defendants' wrongful course of conduct.

42.     Additionally, the Company has established a Code of Ethics ("Code") that applies to all employees of the Company. The conduct of the Individual Defendants alleged herein constitutes a violation of the Company's Code. The Code provides, among other things, the following:

> As employees, officers and directors of a global company, each of us must comply with the letter and spirit of every applicable local, state, federal and foreign law or regulation. Violations of these laws can be extremely costly to WMS Industries Inc. and its subsidiaries (collectively, "WMS") and can subject us to both civil and criminal penalties. Each of us is responsible for understanding the laws and regulations that relate to our responsibilities.
>
> * * *
>
> As a public company, it is of critical importance that WMS' filings with the Securities and Exchange Commission be accurate and timely. Depending on their position with WMS, any of us, whether employees, officers or directors, may be called upon to provide information to assure that WMS' public reports and other public communications are complete, fair and understandable. WMS expects all of us to take this responsibility seriously and to provide prompt and accurate answers to inquiries related to its public disclosure requirements. The Chief Executive Officer and Finance Department personnel have a special role both to adhere to these principles themselves and also to insure that a culture exists throughout WMS as a whole that insures the fair and timely reporting of WMS' financial results and condition. The Chief Executive Officer and Finance Department personnel, in addition to adhering to all other provisions of this Code of Conduct, are responsible for promptly bringing to the attention of the Audit Committee any material information of which he or she may become aware that affects the disclosures made by WMS in its public filings or otherwise assisting the Audit Committee in fulfilling its responsibilities as specified in its Charter.
>
> * * *
>
> We all have a responsibility to understand and follow the Code of Conduct. In addition, we are all expected to perform our work with honesty and integrity in any areas not specifically addressed by the Code of Conduct. A violation of this Code of Conduct may result in appropriate disciplinary action including the possible termination from employment with WMS, without additional warning.

16

## SUBSTANTIVE ALLEGATIONS

43.     On November 1, 2010, the Company reported its first quarter 2011 financial results in a press release. The Company reported total revenues of $187 million and diluted earnings per share of $0.33, which beat Wall Street consensus earnings estimates by a penny. The Company noted that demand for its new Bluebird xD game was the catalyst to overcoming a soft environment for replacement sales. The Company set second quarter 2011 revenue guidance and reaffirmed its full year fiscal 2011 revenue forecast of $830 to $850 million and claimed it was "on track" to report year-over-year revenue and margin gains, notwithstanding the weak gaming environment:

> WMS Reports Quarterly Earnings of $0.33 Per Diluted Share, Including $0.04 Per Diluted Share Facility Closure Charge
>
> ***
>
> - Initiates Fiscal Second Quarter Revenue Guidance of $198-to-$205 Million and Operating Margin Guidance of 19.0%-to-19.5% -
>
> . . . WMS today initiated revenue guidance for the December 2010 quarter of $198-to-$205 million with an operating margin of 19.0%-to-19.5%.
>
> ***
>
> •      Total revenues rose 13% to a fiscal first quarter record of $187.5 million;
>
> •      Total product sales revenues grew 25% to $111.2 million as global new unit shipments rose 10% to 5,338 units and average selling price increased 10% to a record $16,504 per unit, reflecting strong customer demand for the new Bluebird xDTM gaming machines . . . .
>
> ***
>
> "Fiscal 2011 first quarter total revenues and product sales revenues rose to record first quarter levels as strong demand for our new Bluebird xD gaming machine contributed to our ability to overcome the challenging industry environment for replacement unit sales," said Brian R. Gamache, Chairman and Chief Executive Officer. "WMS is on track to achieve year-over-year gains in revenue and operating margin in fiscal 2011 . . . ."

17

44. Following the November 1, 2010 press release announcing the Company's first quarter 2011 financial results, WMS held a conference call for analysts and investors to discuss the financial results and the Company's outlook for the remainder of the year. The call was hosted by CEO Gamache, CFO Schweinfurth, and WMS President Orrin J. Edidin ("Edidin"). During the call, WMS reiterated the financial forecast for fiscal 2011, including margins and revenues, and assured that the Company's strength in operating execution would permit it to meet its forecasted fiscal 2011 financials results, even without any recovery in the game replacement market:

[Gamache:] Our full-year guidance for fiscal 2011, which we reiterated this afternoon, underscores our expectation that we will continue to achieve top and bottom line growth throughout our fiscal year in the face of the continued impact from the slow replacement cycle . . . .

\*\*\*

When you combine our top line success with our vigilance on operating execution, you will see why we have been able to consistently achieve our targets for growth in revenues, profitability and cash flow.

\*\*\*

We couple this ability to drive revenue growth with our intense focus on driving continuous improvement in our operating execution.

45. After the report of the November 1, 2010 results and conference call, WMS Industries' stock price increased from a close of $41.50 on November 1, 2010 to $43.27 on November 2, 2010.

46. In December 2010, the Company, through WMS Vice President of Investor Relations William H. Pfund ("Pfund"), met with analysts to discuss margins on the Company's key gaming products, including the Company's newest product, Bluebird xD. Analysts later reported that Pfund had repeated comments made by WMS

management during the November 1, 2010 conference call, *i.e.*, that WMS Industries would, in fact, achieve increased fiscal 2011 margins even without the benefit of a recovery in the replacement cycle and that June quarter 2011 margins could reach 55%. For example, a December 15, 2010 Morgan Joseph report discussed recent meetings that it had with WMS Industries, including Pfund:

> We hosted investor meetings in the Midwest with WMS Vice President of Investor Relations Bill Pfund. . . . Of course, no investor meeting with a slot manufacturer would be complete without questions regarding the domestic replacement cycle. Mr. Pfund addressed that subject as well.

> ***

> WMS believes it can increase margins without an increase in the replacement cycle. BBxD did not hit initial margin targets due to changes in design too far along in the process. However, WMS believes it made the necessary corrections and that product sales margins in the June quarter should be able to reach 55%, which would exceed year-ago margins.

47.     On January 25, 2011, the Company issued a press release announcing its financial results for its second quarter of fiscal 2011. The report was disappointing in light of the Company's recent positive comments about demand and execution. The Company reported $200 million in revenue for the quarter, but missed Wall Street analyst consensus earnings expectations, reporting only $0.44 as compared to consensus earnings estimates of $0.45. The Company also reported year-over-year declines in product sales margin, game operations margins and gross operations margins and lowered its fiscal 2011 margin forecast. However, in the press release and subsequent conference call, focusing on purported "ongoing worldwide demand" for the Company's Bluebird xD, "huge demand" for the Company's newly released The Great and Powerful/OZ and Godfather gaming products, and the Company's operational execution, WMS again

reaffirmed the Company's 2011 revenue guidance of up to $850 million and initiated third quarter 2011 revenue and operating margin guidance of $209-$215 million and 20.5%-21%, respectively. The Company's press release stated the following in pertinent part:

> WMS Industries Inc., a leader in the design, manufacture and distribution of games and gaming machines to the global gaming industry, today reported results for its fiscal second quarter ended December 31, 2010. In addition, WMS reiterated its fiscal 2011 annual revenue guidance of $830-to-$850 million and revised its annual operating margin guidance to 20.5%-to-21.0% to reflect first-half fiscal 2011 results . . . . WMS also initiated fiscal 2011 third quarter revenue guidance of $209-to-$215 million, a 6%-to-9% increase over the comparable quarter a year ago, with an expected operating margin of 20.5%-to-21.0%.

***

> "WMS' revenue gains were again driven by strong global demand for our Bluebird2 and new Bluebird xD premium gaming machines . . . ."

> . . . "Reflecting our first-half fiscal 2011 performance and the ongoing worldwide demand for our premium Bluebird xD and Bluebird2 cabinets, we are reaffirming our fiscal 2011 revenue guidance of $830 million to $850 million."

48.     On January 25, 2011, after the publication of the press release announcing WMS Industries' second quarter 2011 financial results, the Company held a conference call for analysts and investors to discuss the details of the financial results. The call was hosted by CEO Gamache, CFO Schweinfurth and Company President Edidin. Notwithstanding the second quarter 2011 earnings and margins shortfalls and the lowering of the fiscal 2011 margin expectations, management's comments during the conference call were laden with bullish statements about second half fiscal 2011 growth in the face of industry reports indicating that the gaming machine replacement market was weakening:

20

[Gamache:] Given our performance in the first half of fiscal 2011, and our current visibility for the second half, we are reaffirming our full year guidance today of $830 million to $850 million.

\*\*\*

[Schweinfurth:] The continuing positive player feedback from the field supports our assumption of ongoing steady growth in the second half, despite continued expectations that there will not be a meaningful improvement in the replacement cycle in calendar 2011.

\*\*\*

[Gamache] [O]ur performance in fiscal 2011 remains solidly on track to generate quarterly sequential revenue and operating margin growth over the next two quarters . . . .

\*\*\*

With our track record of innovation in chip share gains . . . we have offset the impact of the economy and the gaming industry challenges by profitably demonstrating the shareholder value that our investments create.

49.    During the question and answer session, analysts challenged WMS'

management on how the Company's growth estimates could be achieved in light of the

second quarter 2011 results and why investors should have confidence that the Company

could meet its reaffirmed fiscal 2011 and third quarter 2011 guidance:

[Analyst:] Right. So what we're still seeing is a pretty steep ramp-up in the back half of the fiscal year, and irrespective of seasonality, can you talk about just what gives – what should give us all confidence that those are achievable? . . .

. . . [Gamache:] We've never had a back half of the year loaded with this kind of product launch, ever in the history of our company. We've got 12 new G-plus Deluxe games for sale that are coming out over the next few months. . . .

In addition to [sic], the xD performance still is very, very strong, and there's great demand for that, I would call, premium-priced product. In addition, as we mentioned, the participation business is going to be stock full.

\*\*\*

21

[Gamache:] The Great and Powerful Oz is performing at The Wizard of Oz type of numbers, and we've got a great backlog that we're rolling out as we speak. The Godfather just got approved recently in Nevada, and we're starting to roll that out, and again, we expect great things.

The big response, as Orrin mentioned, is at G2E. The international folks are clamoring for this product, and certainly it's resonating in the international markets far beyond our expectations . . . .

[Edidin:] Yes, correct, I think we may have even internally underestimated the popularity of this brand in terms of its – how it resonates with some of our international customers, particularly Latin America, South America. As Brian said, there's just a huge demand for this product.

## THE TRUE FACTS BEGIN TO BE REVEALED

50.     On April 11, 2011, WMS Industries shocked investors with the pre-announcement of its financial results for its fiscal 2011 third quarter, disclosing that it would miss previously forecasted third quarter 2011 revenue, earnings and margin results. As opposed to Wall Street consensus earnings estimates of $0.51 per share, the Company would post only $0.40-$0.42 per share and year-over-year margin declines. In addition, and in direct contrast to bullish statements made on January 25, 2011 about strong demand, new product launches and unsurpassed execution, the Company reported that due to "execution challenges," weak demand, delays in the development of new products, and slower regulatory process approval, third quarter revenue would fall as much as $24 million short of the top-end forecasts and fiscal 2011 revenues would miss by up to $60 million:

WMS Reports Preliminary Fiscal 2011 Third Quarter Results

- Initiates Fiscal 2011 Fourth Quarter and Fiscal 2012 Revenue and Operating Margin Guidance –

***

. . . WMS Industries Inc. today reported preliminary results for the fiscal third quarter ended March 31, 2011. Based upon preliminary financial

22

data, WMS expects total revenue to be approximately $191-to-$193 million, which is below the Company's third quarter revenue guidance range of $209-to-$215 million. WMS expects diluted earnings per share to be in a range of $0.40-to-$0.42 per share for the March 2011 quarter.

"Our third quarter results are clearly a disappointment and reflect several factors including lower-than-anticipated new unit demand in the March 2011 quarter, WMS' execution challenges that resulted in approximately $8 million in product sales revenue from customers' orders that shipped in April instead of the March 2011 quarter, and continued challenges in commercializing new products, including a slower rate of initial regulatory process approvals . . . .

\*\*\*

Notwithstanding the expected March 2011 quarterly revenue levels, the Company expects total gross profit margin to be in line with the December 2010 quarter total gross profit margin reflecting an improvement in gaming operations gross margin with gaming operations being a slightly higher percentage of total revenues, and a decline in product sales gross margin primarily due to higher revenues and lower margin from used gaming machines. The Company's operating margin for the March 2011 quarter is also expected to be relatively flat on a quarterly sequential basis reflecting lower gross profit due to lower revenues offset by lower operating costs related to expense containment initiatives.

51.      In addition to pre-announcing a miss of its third quarter and fiscal 2011

financial forecasts, the Company stated that it did not expect demand for its products to

recover for the remainder of fiscal 2011 or for fiscal 2012:

"[B]ased on recent customer capital budgets and unit demand trends, we don't expect meaningful improvements in the industry environment over the remainder of calendar 2011 or, at this point, for calendar 2012 and today we issued revenue guidance accordingly."

\*\*\*

[T]he Company has revised its fiscal 2011 revenue guidance to a range of $790-to- $800 million representing 3%-to-5% annual growth. . . .

. . . WMS anticipates Fiscal 2012 revenue will rise 3%-to-7% over the Fiscal 2011 guidance, or a range of $810-to-$850 million, with an expected operating margin improvement to a range of 21%-to-22%.

23

52.     On April 12, 2011, as a result of these alarming disclosures, WMS Industries' stock price declined more than 17% to close at $30.01 on massive volume of 9.8 million shares traded, down from a close of $36.22 on April 11, 2011.

53.     WMS' representations concerning the Company's current business and financial condition, including its forecasted financial results, were each materially false and misleading when made because the Company failed to disclose the following true facts which were known or recklessly disregarded:

(a)     The Company's purported current "execution" on business operations was faltering and could not drive and support revenue and profitability guidance;

(b)     The industry-wide weak replacement cycle had negatively impacted the Company's sales and margin growth and could not be offset by currently flawed execution and demand for WMS Industries' gaming machines; and

(c)     As a result of the above, the Company did not have a reasonable basis for its revenue and margin forecasts for fiscal 2011 in light of known negative business and industry trends.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

54.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered, and to be suffered, by the Company as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. The Company is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction in this Court that it would not otherwise have.

55.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

24

56.     Plaintiff is the owner of the Company common stock and was the owner of the Company's common stock at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

57.     At the time that this action was commenced, the Company's Board consisted of the following directors: Defendants Gamache, Louis Nicastro, Rabin, Bahash, Nazemetz, Neil Nicastro, Sheinfeld, Siller, Vareschi, Wyche, and Bach.

58.     As a result of the facts set forth herein, Plaintiff has not made any demand on the WMS Board to institute this action against the Individual Defendants. Such demand would be a futile and useless act with respect to each and every one of the Individual Defendants because they are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons:

        a.      The Company has admitted that Defendant Gamache was not independent director pursuant to the requirements of the listing standards of the NYSE and the Director Independence Categorical Standards ("Categorical Standards"). Specifically, Gamache currently serves as CEO and for the fiscal year 2010 received $4,757,330 for total compensation as the Company's CEO;

        b.      Pursuant to an Advisory Agreement between the Company and Louis Nicastro dated May 5, 2008 that was amended on September 16, 2010, Louis Nicastro provides business advisory services to the Company, in exchange for which Louis Nicastro receives $450,000 per year in equal monthly installments. Pursuant to the 2010 amendment of the Advisory Agreement, instead of expiring on June 30, 2011, the agreement will automatically renew for one-year terms ending June 30, unless either party provides not less than 90 days notice not to review prior to the expiration of the agreement. Thus, Louis Nicastro cannot exercise independent, objective judgment in deciding whether to bring or prosecute this action on behalf of WMS because he is personally interested as a result of the substantial compensation that he has received from the Company, and will continue to receive from the Company, pursuant to the Advisory Agreement;

        c.      Neil Nicastro is the son of Louis Nicastro. As a result of this familial relationship, both Neil Nicastro and Louis Nicastro are conflicted in making any supposedly independent determinations and are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action on behalf of the Company because if either were to institute an action on behalf of the Company, it would

substantially impact a close family member. Indeed, the Company has admitted that Neil Nicastro and Louis Nicastro were not independent directors pursuant to the requirements of the listing standards of the NYSE and the Categorical Standards;

       d.     Defendants face a substantial likelihood of being held liable for breaching their fiduciary duties of loyalty and good faith as alleged herein, and are therefore incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action;

       e.     WMS's non-employee directors have received, and continue to receive, substantial compensation in the form of cash and stock option awards. These defendants are interested in maintaining their positions on the Board so as to safeguard their substantial compensation and stock options, which demonstrates that demand upon such individuals would be futile:

| 2010 DIRECTOR COMPENSATION | | | | |
|---|---|---|---|---|
| DIRECTOR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | OTHER COMPENSATION | TOTAL |
| Harold H. Bach, Jr. | $140,000 | $224,987 | $336 | $365,323 |
| Robert J. Bahash | $145,000 | $224,987 | $336 | $370,323 |
| Patricia Nazemetz | $127,500 | $224,987 | $336 | $352,823 |
| Louis J. Nicastro | $112,500 | $224,987 | $474,533 | $812,020 |
| Neil D. Nicastro | $122,500 | $224,987 | $14,538 | $362,025 |
| Edward W. Rabin, Jr. | $195,000 | $224,987 | $336 | $420,323 |
| Ira S. Sheinfeld | $112,500 | $224,987 | $336 | $337,823 |
| Bobby L. Siller | $127,500 | $224,987 | $16,988 | $369,475 |
| William J. Vareschi, Jr. | $147,500 | $224,987 | $11,533 | $384,020 |

       f.     The entire WMS Board and senior management participated in the wrongs complained of herein. For the reasons described herein, WMS's directors are not disinterested or independent. Pursuant to their specific duties as Board members, each was charged with the management of the Company and the conduct of its business affairs. Each of the above-referenced defendants breached the fiduciary duties they owed to WMS and its shareholders in that they failed to prevent and correct the dissemination of the Company's false and misleading statements. Thus, the WMS Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome because their actions have subjected WMS to millions of dollars in potential liability for violations of applicable securities laws;

       g.     Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein thereby rendering demand futile;

h.     The Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from WMS's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

i.     In order to bring this suit, all of WMS's directors would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

j.     The acts complained of constitute violations of the fiduciary duties owed by WMS's officers and directors and these acts are incapable of ratification;

k.     Each of the Individual Defendants authorized and/or permitted the false statements disseminated directly to the public and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if they instituted it;

l.     Any suit by the Company's current directors to remedy these wrongs would likely expose the Individual Defendants and WMS to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

m.     WMS has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for WMS any part of the damages WMS suffered and will suffer thereby; and

n.     If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in a class action complaint for violations of securities law, which admissions would impair their defense of the class action and greatly increase the probability of their personal liability in the class action, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants. Thus, the Individual Defendants would be forced to take positions contrary to the defenses they will likely assert in the securities class action.

59.     Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by Plaintiff, the current Board has failed and refused to seek to recover for WMS for any of the wrongdoing alleged by Plaintiff herein.

60.     Plaintiff, moreover, has not made any demand on shareholders of WMS to institute this action since demand would be a futile and useless act for the following reasons:

27

a.      WMS is a publicly held company with over 57 million outstanding shares. shares outstanding, and thousands of shareholders;

b.      Making demand on such a number of shareholders would be impossible for Plaintiff who has no way of finding out the names, addresses of phone numbers of shareholders; and

c.      Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

61.      Furthermore, the conduct complained of herein could not have been the product of good faith business judgment, and each of these directors faces a substantial likelihood of liability for breaching their fiduciary duties because, through their intentional misconduct, they have subjected WMS to substantial damages. Furthermore, the conduct of the Individual Defendants has subjected the Company to potential liability in connection with a securities fraud class action currently pending in the United States District Court for the Northern District of Illinois. Through their intentional misconduct, Individual Defendants have subjected the Company to potential costs, fines, and judgments associated with the securities class action. Such actions by the Individual Defendants cannot be protected by the business judgment rule. Accordingly, making a pre-suit demand on the Individual Defendants would be futile.

## COUNT I
## (AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY)

62.      Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

63.      The Individual Defendants owed a fiduciary duty to WMS to supervise the issuance of the Company's press releases and public filings to ensure that they were truthful and accurate and that such filings conformed to applicable securities laws. The Individual Defendants, however, breached their fiduciary duties by failing to properly

28

supervise and monitor the adequacy of WMS's internal controls and by allowing the Company to issue and disseminate misleading statements and filings.

64.     Defendants have engaged in a sustained and systematic failure to exercise their oversight responsibilities and to ensure that WMS complied with applicable laws, rules and regulations.

65.     As members of the WMS Board, the Individual Defendants were directly responsible for authorizing, permitting the authorization of, or failing to monitor the practices that resulted in violations of applicable laws as alleged herein. Each of them had knowledge of and actively participated in, approved, and/or acquiesced in the wrongdoing alleged herein or abdicated his or her responsibilities with respect to this wrongdoing.     The alleged acts of wrongdoing have subjected the Company to unreasonable risks of loss and expenses.

66.     Each of the Individual Defendants' acts in causing or permitting the Company to disseminate material misrepresentations and omissions to the investing public and abdicating his or her oversight responsibilities to the Company have subjected the Company to liability for violations of applicable laws, and therefore were not the product of a valid exercise of business judgment, constituting a complete abdication of their duties as officers and/or directors of the Company. As a result of the Individual Defendants' breaches, WMS is the subject of a major securities fraud class action lawsuit by defrauded investors, and the Company's reputation in the business community and financial markets has been irreparably tarnished.

## COUNT II
## (AGAINST THE INDIVIDUAL DEFENDANTS FOR GROSS MISMANGEMENT)

67.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

68.     The Individual Defendants had a duty to WMS and its shareholders to prudently supervise, manage, and control the operations, business, and internal financial accounting and disclosures of the Company.  The Individual Defendants, however, by their actions and by engaging in the wrongdoing alleged herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of WMS in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, the Individual Defendants breached their duties of due care, diligence, and candor in the management and administration of WMS's affairs and in the use and preservation of the Company's assets.

69.     During the course of the discharge of their duties, the Individual Defendants were aware of the unreasonable risks and losses associated with their misconduct.  Nevertheless, defendants caused WMS to engage in the scheme described herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties to the Company.  As a result, the Individual Defendants grossly mismanaged WMS, thereby causing damage to the Company.

## COUNT III
## (AGAINST THE INDIVIDUAL DEFENDANTS FOR CONTRIBUTION AND INDEMIFICATION)

70.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

71.     WMS is alleged to be liable to various persons, entities and/or classes by virtue of the facts alleged herein that give rise to defendants' liability to the Company.

72.     WMS's alleged liability on account of the wrongful acts, practices, and related misconduct alleged arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of the Individual Defendants, and the Company is entitled to contribution and indemnification from each Individual Defendant in connection with all such claims that have been, are, or may in the future be asserted against WMS, by virtue of the Individual Defendants' misconduct.

## COUNT IV
## (AGAINST THE INDIVIDUAL DEFENDANTS FOR ABUSE OF CONTROL)

73.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

74.     The Individual Defendants' conduct, as alleged herein, constituted an abuse of their control over WMS.

75.     As a direct and proximate result of the Individual Defendants' abuse of control, the Company has suffered, and will continue to suffer, damages for which the Individual Defendants are liable. Plaintiff, moreover, has no adequate remedy at law.

## COUNT V
## (AGAINST THE INDIVIDUAL DEFENDANTS FOR
## WASTE OF CORPORATE ASSETS)

76.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

77.     The Individual Defendants' conduct, as alleged herein, constituted a waste of the corporate assets of WMS.

31

78. As a direct and proximate result of the Individual Defendants' abuse of control, the Company has suffered, and will continue to suffer, damages for which the Individual Defendants are liable. Plaintiff, moreover, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A. Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

C. Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

32

/s/ *Patrick V. Dahlstrom*
Patrick V. Dahlstrom
Leigh Handelman Smollar
Joshua B. Silverman
POMERANTZ HAUDEK GROSSMAN
& GROSS LLP
10 South LaSalle Street, Ste. 3305
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184

Patrick W. Powers
State Bar Card No. 24013351
patrick@powerstaylor.com
Peyton J. Healey
State Bar Card No. 24035918
peyton@powerstaylor.com
POWERS TAYLOR LLP
8150 North Central Expressway, Suite
1575
Dallas, Texas 75206
Telephone: 214-239-8900
Facsimile: 214-239-8901

THE BRISCOE LAW FIRM, PLLC
WILLIE C. BRISCOE
The Preston Commons
8117 Preston Road, Suite 300
Dallas, Texas 75225
Telephone: (214) 706-9314
Facsimile: (214) 706-9315

Lionel Z. Glancy
Ex Kano S. Sams II
GLANCY BINKOW & GOLDBERG
LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

**ATTORNEYS FOR PLAINTIFF**